## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **KALYNN CROFT and TANYA PETTY, individually and on behalf of similarly situated persons,** | |
| **Plaintiffs,** | **CIVIL ACTION FILE NO.:** |
| | _____ |
| **vs.** | |
| **MARDI GRAS MANAGEMENT, INC.; MICHAEL FULTON and P.G. PHIFER,** | **FLSA COLLECTIVE ACTION** |
| **Defendants.** | **JURY DEMAND** |

## <u>COMPLAINT</u>

COME NOW Plaintiffs KALYNN CROFT and TANYA PETTY, individually and on behalf of similarly situated persons, and by and through their attorneys, file this Complaint for violation of the minimum wage, overtime and tip provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*., as amended by the Tip Credit Protection Act of 2018, 29 U.S.C. § 203 (hereafter "FLSA") against Defendants MARDI GRAS MANAGEMENT, INC., MICHAEL FULTON and P.G. PHIFER, as follows:

## INTRODUCTION

1.      Plaintiffs KALYNN CROFT and TANYA PETTY and the collective action members are current or former entertainers of Defendants who were misclassified as independent contractors by Defendants and deprived of their rights to be paid the minimum and overtime wages and retain their duly earned tips under the FLSA. They seek recovery of their lost minimum and overtime wages and tips, an equal amount in liquidated damages and reasonable attorneys' fees and costs incurred as a result of Defendants' unlawful activities.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 because this action arises under the FLSA.

3.      Venue is proper in this District because all or a substantial portion of the events forming the basis of this action occurred in this District. Defendants' club is located in this District and Plaintiffs and the collective action members worked in this District.

## PARTIES

4.      Plaintiff KALYNN CROFT a/k/a "Skylar" ("Croft") is a former employee of Defendants, having been employed from March 20, 2015 and continuing to July 28, 2017.

5.      Plaintiff TANYA PETTY a/k/a "Gizelle" ("Petty") is a former employee of Defendants, having been employed beginning on November 25, 2014 and continuing to June 30, 2017.

6.      The collective action members are current or former entertainers who were employed by Defendants as entertainers during the past three (3) years.

7.      Defendant MARDI GRAS MANAGEMENT, INC. ("Mardi Gras") is a Georgia Corporation with its principal place of business located at 6300 Powers Ferry Road, Sandy Springs, Georgia. At all times mentioned herein, Mardi Gras acted as the "employer" of Plaintiffs and the collective action members within the meaning of the FLSA.

8.      Defendant P.G. Phifer is the Chief Executive Officer of Mardi Gras. Michael Fulton is the Chief Financial Officer of Mardi Gras. Phifer and Fulton acted directly or indirectly on behalf of Mardi Gras with respect to Plaintiffs and collective action members' compensation and other terms and conditions of their employment, and, at all times mentioned herein were an "employer" or joint employer of Plaintiffs and the collective action members within the meaning of the FLSA.

## COMMON FACTUAL ALLEGATIONS

9.     During the three years prior to the filing of this complaint (hereinafter "the relevant time period") Defendants owned and operated the Mardi Gras, an Atlanta, Georgia, nightclub featuring nude female dancers (hereinafter "the Club").

10.     Plaintiffs and the collective action members are current and former adult entertainers employed by Defendants at the Club during the relevant time period.

11.     The Club hires entertainers to dance partially or fully nude at the Mardi Gras Club.

12.     Mardi Gras's entertainers typically dance for Mardi Gras's customers on stage or tableside or in private VIP rooms.

### A.     Employment/Joint Employment.

13.     At all times during the relevant time period, Phifer and Fulton were owners, officers or directors and were involved in the day-to-day operation of the Club.

14.     During the relevant time period, Phifer and Fulton made significant decisions affecting the employment and compensation of Plaintiffs and the collective action members, including (i) the decision to misclassify Plaintiffs and other dancers as independent contractors rather than employees; (ii) to not pay them the minimum

wage required by the FLSA; (iii) to not pay them the overtime wage required by the FLSA; and (iv) to seize their tips in violation of TIPA and the FLSA.

15.    Upon information and belief, Phifer and Fulton were the only persons affiliated with Mardi Gras vested with the authority to classify entertainers as employees and change their compensation structure to comply with the FLSA.

16.    Mardi Gras, Phifer and Fulton made decisions such as for whom and how many employees to hire; how to design the employees' management structure; when the work day began and ended; when the employees would stop and start during and throughout the day; whether an employee should be discipled, fired or retained; monitored dancers/entertainers several times each day and instructed employees to remedy any identified problems; retained authority to hire, fire, or modify the employment conditions of the dancer/entertainers; retained the authority to set the dancers/entertainers' pay rate or method of payment; were intimately involved in payroll procedures and decisions affecting dancers and their pay; and owned the business and facilities located at 6300 Powers Ferry Road.

## B.    Interstate Commerce.

17.    At all times during the relevant time period, the Club was an "enterprise engaged in commerce or in the production of goods for commerce" as defined in the FLSA.

18.     At all times during the relevant time period, the Club was an enterprise engaging in interstate commerce by having multiple employees regularly selling alcoholic beverages produced and shipped from outside of the State of Georgia, regularly serving foods produced and shipped from outside of the State of Georgia, and having multiple employees regularly processing out-of-state credit card sales in the furtherance of its business.

19.     During 2015, 2016, 2017 and 2018, the Mardi Gras had an annual gross volume of sales made or business done of not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated) within the meaning of 29 U.S.C. § 203(s)(1)(A).

20.     At all times during the relevant time period, the Club had two or more "employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person," as defined in the FLSA.

## C.     Employment Relationship.

21.     The Club exercised a significant degree of control over the work of entertainers at the Club.

22.     At all times during the relevant time period, the Club maintained and enforced written rules of conduct for dancers which the Club retained and which

were addressed at the time of hiring as well as when discipline was administered, but which were not provided in writing to the dancers/entertainers.

23.     Mardi Gras's house moms regularly cited the rules and Club's expectations with each entertainer and administer check-in procedures, weigh-in on scales maintained by the Club, and issued warnings for rule violations.

24.     At all times during the relevant time period, the duties of Club management included ensuring that dancers complied with Club rules and policies.

25.     The Club requires each entertainer to perform all work on its premises, and provided the customers, building, sound systems, stages, VIP rooms, music, lighting, support staff, alcohol, food, and other facilities and personnel necessary for an entertainer to dance for a living.

26.     At all times during the relevant time period, the Club provided the premises and all facilities necessary for each entertainer to work and earn her living.

27.     At work, each entertainer was managed and supervised by the Club's managers, house moms and floormen.

28.     The Club directly and indirectly controlled dancers' work schedules by requiring them to work a minimum number of shifts per week and hours per shift and calling or texting them virtually daily to fill in shifts when the Club was short

on entertainers. The Club required mandatory Friday work as well as work on either a Monday or Tuesday ("slow days").

29.     Each entertainer was required to sign in the time of arrival, disclose the amount of her tip outs, and to sign out at the time of her departure for each shift she worked.

30.     During a shift, an entertainer may not leave the premises without permission of management or a house mom.

31.     After receiving permission to leave early, entertainers were required to pay a $50.00 fine to the Club in addition to their regular mandatory tip outs.

32.     Entertainers were required to obtain permission from management or a house mom to miss a scheduled shift and were disciplined for "no calls" or "no shows" for scheduled shifts.

33.     The discipline for a no call/no show included suspension or termination.

34.     During shifts entertainers are required to dance stage sets when called to the stage by Mardi Gras's disc jockey.

35.     Club rules required the entertainer to take off her top after receiving a $5.00 tip and to take off her bottoms after receiving a $10.00 tip. Entertainers were required to comply with this Club rule.

36.     The Club's DJ's called entertainers by their stage name to dance on stage on a set rotation established and enforced by the Club.

37.     Entertainers were required to dance for each song of their stage sets or pay another dancer to dance for them.

38.     Entertainers worked for tips. Entertainers who missed a stage set were disciplined by being taken off the stage rotation list.

39.     Mardi Gras's entertainers were required to stay on stage until their replacement arrives.

40.     If a replacement does not arrive the entertainers must remain on stage and dance until an entertainer does arrive to replace her.

41.     Mardi Gras enforced rules about how an entertainer may dance while on stage and prohibited certain various behaviors by the entertainer.

42.     Typically, each entertainer was required to dance one or more stage sets every hour, sometimes as many as three or four sets in an hour, unless a large number of entertainers were working that particular shift.

43.     Mardi Gras's entertainers required to dress before leaving the stage.

44.     Mardi Gras did not permit its entertainers to walk around the club partially or fully naked. Entertainers were to be paid tips as a condition of removing their clothes.

45.    The Club's house moms and managers regularly evaluated the appearance and dress of dancers at the Club and required weigh-ins for some entertainer who they considered overweight.

46.    Mardi Gras enforced dress and appearance requirements consistent with the image they wish to maintain for their entertainers.

47.    Each entertainer was expected to wear a costume to work complying with Mardi Gras standards and was encouraged to purchase costumes provided by the Club.

48.    Mardi Gras's entertainers were required to wear a garter and high heels as part of their costume, and a butt cover when walking about the Club. On Fridays, Mardi Gras entertainers were permitted to wear flats for "casual Friday."

49.    Each entertainer is expected to have their hair done, nails and toenails painted, make-up on and costumes clean and in good condition.

50.    The Club's house moms and managers have the authority to require dancers to change their appearance and attire at work.

51.    On occasion during the relevant time period, the Club's house moms and managers required dancers to change their appearance and attire at work.

52.    During the relevant time period, the Club's managers had the authority to suspend and discipline dancers.

53.    During the relevant time period, the Club's managers supervised dancers on a day-today basis.

54.    At times during the relevant time period, the Club required dancers to attend meetings.

55.    At times during the relevant time period, the Club used mandatory dancer meetings to discuss problems with dancer dress, hair, makeup, weight, and appearance, Club promotional efforts and other work-related issues.

56.    At times during the relevant time period, the Club's managers and house moms suspended and disciplined entertainers for violation of Mardi Gras's rules.

57.    During the relevant time period, the Club paid all costs associated with advertising, marketing, and promoting the Club.

58.    The Club rents or owns the property on which the Club is located.

59.    During the relevant time period, the Club paid all costs associated with running and operating the Club.

60.    At all times mentioned herein, each entertainer was dependent entirely upon the Club's customers to compensate her for working at the Club.

61.    The Club's customers are derived from the Club's advertising and marketing efforts and the Club's reputation from operating the Mardi Gras for many years.

62.    The Club required Club customers to pay a "door fee" to enter the business.

63.    The Club had ultimate authority as to which individuals were allowed to enter the Club as customers.

64.    At all times during the relevant time period, the Club's managers and house moms had the discretion not to permit a dancer to work on the premises.

65.    At all times during the relevant time period, the Club enforced a mandatory check-out process for the Club's dancers, which included the payment of various fees to the Club and its managers, house moms, and DJs.

66.    Mardi Gras provided and maintained all stages used for dancer performances at the Club.

67.    The Club provided all poles used for dancer performances at the Club.

68.    The Club provided VIP rooms for entertainers' use with customers.

69.    The Club provided the floor and tables at which its entertainers danced.

70.    The Club provided the sound system, lighting and music used by entertainers to dance at work.

71.     The Club provided food and alcohol for its customers.

72.     At all times during the relevant time period, the Club was responsible for day-to-day purchases of liquor and food for sale at the Club.

73.     The Club makes substantial profits from its operations.

74.     An entertainers' ability to increase her earnings is largely based upon her looks and working harder or longer hours.

75.     At all times during the relevant time period, the Club did not require the Club's dancers to have prior experience as dancers or any formal or special training.

76.     At all times during the relevant time period, when an individual wanted to work as a dancer at the Club, a house mom and/or manager generally performed a "body check" to determine if the individual's body was suitable for performing at the Club.

77.     An entertainer is hired by Mardi Gras largely because of her "appearance" and willingness to take off her clothes in front of others.

78.     Mardi Gras's entertainers are hired indefinitely like most employees.

79.     Croft and Talley each worked in excess of two (2) years for Mardi Gras.

80.    At the time of hiring, Mardi Gras hopes the entertainer will work for Mardi Gras for a significant duration.

81.    At times during the relevant time period, the Club advertised its business using pictures of scantily clad women.

82.    The Mardi Gras is well known as a "strip club," "gentlemen's club" or an "adult entertainment club."

83.    Mardi Gras's customers frequent the Club to watch nude dancing.

84.    The presence of nude dancers was and is integral to the Club's business success and operations as a strip club.

85.    Plaintiffs and the collective action members were and are economically dependent on the compensation they received from working at the Mardi Gras.

86.    At all times during the relevant time period, Plaintiffs and the collective action members were or are "employees" as that term is used in the FLSA, rather than independent contractors, as a matter of economic reality.

87.    At all times during the relevant time period, Defendants were or are "employers" of Plaintiffs and the collective action members as defined in the FLSA.

88.    At all times during the relevant time period, Plaintiffs and the collective action members were and are not exempt from the minimum wage requirements of the FLSA.

89.     At all times during the relevant time period, Defendants paid no wages to Plaintiffs and the collective action members for any work time on the premises.

90.     Plaintiffs and the collective action members were generally expected to work at least seven hours per shift at least three (3) days per week at the Mardi Gras.

91.     On occasion, Plaintiffs and the collective action members worked over forty (40) hours in a workweek.

92.     In addition, Plaintiffs and the collective action members were required to do their hair, nails, toenails, make-up and bathe and dress for each shift to comply with Mardi Gras's policies and procedures.

93.     The time spent by each entertainer complying with Mardi Gras's appearance and dress requirements typically exceeded one (1) hour per shift.

94.     Mardi Gras did not pay any wages to Plaintiffs and the collective action members for the time spent working on the premises, getting ready for work and waiting to leave the premises after work.

95.     Plaintiffs and the collective action members worked entirely for tips paid by Mardi Gras's customers.

96.     The tip compensation was paid directly by the customer to Plaintiffs and the collective action members unless the tip was paid through a customer's credit card.

97.     Plaintiffs and the collective action members were required to pay Mardi Gras and others to work at the Club.

98.     The required payments to the Club and others were paid entirely from the tip income earned by Plaintiffs and the collective action members. House fees were paid to the Club as a requirement for working at Mardi Gras.

99.     Plaintiffs and the collective action members who arrived on the floor of the Club before noon, dressed and ready were not required to pay a house fee. After noon, entertainers were required to pay a $25.00 house fee and were permitted to stay at the Club until 7 p.m. Entertainers who extended their shift were required to pay $25.00 to $30.00 to stay past 9:00 p.m.

100.   Nightshift entertainers were required to pay from their tips a house fee of at least $50.00. The house fee increased if Plaintiffs or the collective action members arrived after the start of the scheduled shift. Entertainers arriving after 8:00 p.m. were required to pay a house fee of $65.00.

101.   Plaintiffs and the collective action members were required to pay the greater of 10% or $10 from their tips to the Disc Jockey each shift.

102.   Plaintiffs and the collective action members were notified at the time of their hiring that the DJ fee is 10% of gross tips. The minimum DJ fee is $10.00.

103.   If a Mardi Gras customer paid Plaintiffs and collective action members by credit card, Mardi Gras required Plaintiffs and the collective action members to "kick-back" to Mardi Gras a fee from their tips in order to convert the credit card charges to cash.

104.   In addition Mardi Gras often withheld tips derived from credit card charges for up to 90 days or longer, thereby violating the FLSA requirement that tips earned during a workweek be paid during the employees regularly scheduled pay period.

105.   The various fees charged Plaintiffs and the collective members violate the free and clear requirement of the FLSA, and constitute an illegal "kick-back" under the FLSA.

106.   The various fees charged by Mardi Gras to Plaintiffs and the collective action members caused their wages to drop below the minimum wage and the applicable overtime wage during workweeks in which Plaintiffs and the collective action members worked overtime.

## COLLECTIVE ACTION ALLEGATIONS

107.   Plaintiffs re-allege and incorporate by reference the above paragraphs as if fully set forth herein.

108.   Mardi Gras maintained a policy and practice of (i) misclassifying its entertainers; (ii) requiring them to pay to work as described herein; (iii) withholding of tip income; and (iii) not paying them the minimum and overtime wage required by law.

109.   Mardi Gras's unlawful policies and procedures were applied to all entertainers working for Mardi Gras during the past three (3) years.

110.   Like the Collective Action Plaintiffs, there are members of the putative Collective action who are or were subject to the same FLSA violations and wish to join this lawsuit. These individuals would benefit from the issuance of court-supervised notice of this lawsuit and the opportunity to join by filing their written consent. Defendant can readily identify these similarly situated entertainers through its business records and produce their contact information to Plaintiffs' counsel.

111.   The putative class includes:

All entertainers who were employed by Mardi Gras during the past three (3) years.

**COUNT ONE**
**VIOLATION OF 29 U.S.C. §§ 206**

112.   Paragraphs 1 through 111 are incorporated herein by this reference.

113.   At all times material hereto, Plaintiffs and the collective action members were or are employees covered by the FLSA and entitled to the minimum wage protections set forth in FLSA, 29 U.S.C. § 206(a).

114.   At all times material hereto, Defendants failed to compensate Plaintiffs and the collective action members at an hourly rate above or equal to the minimum wage.

115.   At all times material hereto, Defendants and the collective action members willfully failed to compensate Plaintiffs at an hourly rate above or equal to the minimum wage.

116.   Plaintiffs and the collective action members are entitled to payment of their minimum wages in an amount to be determined at trial, in accordance with FLSA § 16(b), 29 U.S.C. § 216(b).

117.   Defendants' requirement that entertainers pay fees and fines to the Club and its managers, house moms, and DJs violated and continue to violate the "free and clear" requirement of 29 CFR 531.35, thereby constituting an unlawful kickback in violation of the FLSA.

118.   The tips earned by Plaintiffs and the collective action members belong to Plaintiffs and the collective action members and Mardi Gras's unlawful taking of

Plaintiffs and the collective action members' tips violate the Tip Income Protection Act of 2018 ("TIP").

119.   Plaintiffs and the collective action members are entitled to receive all unpaid minimum wages from Defendants for the hours that they worked, including the time spent complying with Mardi Gras's onerous dress and appearance requirements and waiting on the premises to comply with Mardi Gras's exit policies.

110.   Plaintiffs and the collective action members are entitled to recover from Defendants all fees and fines that they were required to pay in order to work at the Club as part of their wage loss and for purposes of recovering unlawful taking of their tips in violation of the TIP.

111.   As a result of Defendants' willful underpayment of minimum wages as alleged above, Plaintiffs and the collective action members are entitled to liquidated damages in accordance with FLSA §16(b), 29 U.S.C. § 216(b).

112.   As a result of its underpayment of minimum wages as alleged above, Defendants are jointly and severally liable to Plaintiffs and the collective action members for their litigation costs, including their reasonable attorney's fees, in accordance with FLSA §16(b), 29 U.S.C. § 216(b).

## COUNT TWO
## OVERTIME WAGE CLAIM (Violation of 29 U.S.C. § 207)

113.   Plaintiffs repeat and reallege the allegations in the preceding paragraphs of this Complaint, and incorporate the same herein by this specific reference.

114.   Each Defendant is an "employer" or joint employer of Plaintiffs and each collective action member within the meaning of the FLSA, 29 U.S.C. § 203(d).

115.   Defendants are engaged in "commerce" and/or in the production of "goods" for "commerce" as those terms are defined in the FLSA.

116.   Defendants operate an enterprise engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1), because it has employees engaged in commerce, and because its annual gross volume of sales made is more than $500,000.

117.   Plaintiffs consent to sue in this action pursuant to 29 U.S.C. § 216(b).

118.   A consent to sue executed by each Plaintiff is attached to this demand.

119.   Defendants failed to pay Plaintiffs and all others similarly situated the applicable overtime wage for each hour in excess of forty (40) during each workweek in which they worked in violation of 29 U.S.C. § 207.

120.   Based upon the conduct alleged herein, Defendants knowingly,

intentionally and willfully violated the FLSA by not paying Plaintiffs and the collective action members the overtime wage required under the FLSA.

121.   Throughout the relevant period of this lawsuit, there is no evidence that Defendants' conduct that gave rise to this action was in good faith and based on reasonable grounds. In fact, Defendants continued to violate the FLSA long after it learned that its misclassification scheme and compensation policies were illegal.

122.   Due to Defendants' FLSA violations, Plaintiffs and the collective action members are entitled to recover from Defendants, overtime wage compensation and an equal amount in the form of liquidated damages, as well as reasonable attorneys' fees and costs of the action, including interest, pursuant to 29 U.S.C. § 216(b).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray that this Court grant relief as follows:

a.   Certify this as a collective action and issue notice to collective action members;

b.   As to Count I award Plaintiffs and the collective action members judgment for wages at the minimum rate, including the recovery of all payments reducing wages below the minimum wage, as well as

liquidated damages, interest and attorneys' fees as provided for under the FLSA;

c.      As to Count II award Plaintiffs and each collective action member who joins this lawsuit judgment for overtime wages, including the recovery of all payments reducing wages below the overtime wage,  as well as liquidated damages in an equal amount, interest and attorneys' fees as provided for under the FLSA;

d.      Award Plaintiffs costs of this action, including expert fees;

e.      Grant Plaintiffs and the collective action members a jury trial on all issues so triable; and

f.      Award Plaintiffs such other and further relief as the Court may deem just and proper.

This 19th day of June, 2018.

                                        */s/ Ainsworth G. Dudley*
                                        Ainsworth G. Dudley
                                        Ga. Bar No. 231745
                                        Attorney for Plaintiffs
                                        adudleylaw@gmail.com

DUDLEY LAW, LLC
4200 Northside Parkway
Bldg. 1, Suite 200
Atlanta, GA  30327
404.687.8205

**FLYNN LAW FIRM, LLC**

/s/ Jonah A. Flynn
Jonah A. Flynn
Georgia Bar No. 266555
*Counsel for Plaintiffs*

4200 Northside Parkway NE
Building One, Suite 200
Atlanta, GA 30327
Phone: 404-835-9660
Fax: 404-835-6005
e-mail: jflynn@flynnfirm.com

## **JURY DEMAND**

Pursuant to F.R.C.P 38, Demand is hereby made for trial by jury on all issues raised by these pleadings.

*/s/ Ainsworth G. Dudley*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing pleading complies with the font and point selections approved by the Court in Local Rule 5.1B. This pleading has been prepared in Times New Roman font, 14 point.

By: */s/ Ainsworth G. Dudley*